IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

FILED IN OPEN COURT
JUL 1 8 2025
CLERK, U.S. DISTRICT COURT
NORFOLK, VA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 2:25-cr-3 |
| BRAD KENNETH SPAFFORD, | |
| Defendant. | |

## STATEMENT OF FACTS

The United States and the defendant, BRAD KENNETH SPAFFORD, (hereinafter, "SPAFFORD"), agree that at trial, the United States would have proven the following facts beyond a reasonable doubt with admissible and credible evidence:

### Initial Investigation

1. In January 2023, a law enforcement officer who was then SPAFFORD's neighbor in a residential neighborhood in Suffolk, Virginia, became concerned with SPAFFORD's behavior and spoke about their concerns with a colleague who was a Task Force Officer with the Federal Bureau of Investigation ("FBI"). This neighbor later became a Confidential Human Source ("CHS") for the FBI.

2. The CHS was aware that SPAFFORD was making homemade ammunition, and also noticed that SPAFFORD had disfigured his hand and was missing three fingers, which SPAFFORD told the CHS resulted from a homemade accident. Records obtained from Sentara Obici Hospital showed SPAFFORD was admitted to the emergency room on or about July 31, 2021, with a completely amputated right thumb, partially amputated right middle and index fingers, hearing loss, and scalp lacerations. SPAFFORD falsely told the hospital his injuries were caused by fireworks. The investigation later revealed that SPAFFORD's injuries resulted from

1

his misfire of a launcher at the rural property of Family Member 1 and Family Member 2, in Zuni, Virginia, where SPAFFORD routinely denotated explosives he had made.

3. In April 2023, SPAFFORD commented to the CHS that it would be nice to have an AR platform with a 10-inch barrel, to which the CHS responded one would need to be careful legally. SPAFFORD responded with a comment about "another infringement." Over the following months, the CHS went with SPAFFORD for target practice to a local gun range where SPAFFORD had a membership. On one occasion in May 2023, the CHS observed SPAFFORD at the range with what appeared to a short barrel rifle (*i.e.*, a rifle with a barrel shorter than 16 inches). In June 2023, after shooting at the range with the CHS, SPAFFORD stated that "we need to bring back political assassinations," to which Family Member 3 responded, "for real." During that conversation, SPAFFORD discussed making Tannerite with a substance that makes it as strong as dynamite, and stated he likes to set it off with homemade blasting caps. On another occasion in June 2023, the CHS was at SPAFFORD's residence and SPAFFORD showed them thirty-round magazines that he stated he had cleaned with a special solution to remove DNA and fingerprints, and placed the magazines in what SPAFFORD described as a printless bag that does not collect biometrics. In July 2023, SPAFFORD told the CHS they should go shooting again, and that he was using homemade targets with photographs of the President for target practice.

4. The CHS retired from their law enforcement job and moved away from SPAFFORD's neighborhood in Suffolk; thereafter, SPAFFORD and the CHS continued to communicate electronically. In September 2023, SPAFFORD sent the CHS a picture of a new "go box" in his car, which contained an apparent short-barrel rifle, ammunition, magazines, medical kits, a Tyvek suit, and other items:



On or about July 29, 2024, approximately two weeks after the assassination attempt of then-presidential candidate Donald Trump, SPAFFORD messaged the CHS, "bro I hope the shooter doesn't miss Kamala." On or about the same day, SPAFFORD also told the CHS he was pursuing a sniper qualification at the local range.

5. In September 2024, SPAFFORD, Family Member 3, and Family Member 4, purchased a 20.16-acre rural property in Smithfield, Virginia, in the Eastern District of Virginia. SPAFFORD and his family, including minor children, moved there, and rented out their former

home in Suffolk. On or about October 19, 2024, the CHS visited SPAFFORD at the Smithfield property. SPAFFORD and Family Member 3 gave the CHS a tour of the property. Family Member 3 asked SPAFFORD what was in their deep freezer in the Mason jar, and SPAFFORD responded it was HMTD, which he said he had kept in the freezer for several years as a test to see how long it would last. When Family Member 3 expressed concerns about having it with kids around, and with Family Member 3 digging food out of the same freezer where SPAFFORD stored the HMTD, SPAFFORD responded that was why he had it wrapped in orange tape and marked "danger, don't touch." HMTD, or Hexamethylene Triperoxide Diamine, is an organic peroxide-based primary explosive, and is a white crystalline solid with the appearance of sugar or salt. Primary explosives are highly sensitive, and easily detonate as a result of impact, friction, or temperature changes. SPAFFORD then commented he also had ETN, which is Erythritol Tetranitrate, a secondary explosive. Both ETN and HMTD can be homemade with commercially available chemicals.

6. SPAFFORD also told the CHS he has an AR-15 that is "technically" a SBR, *i.e.*, a short-barrel rifle, but that he doesn't have it registered because he doesn't "believe in any of that." SPAFFORD also sated he wanted to install a turret for a 50-caliber firearm on the roof of his house with an armored plate in order to have 360-degree coverage. The defendant stated, "they can't get close enough if I'm mowin' down on my fifty cal."

7. On or about December 6, 2024, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") reported that it had no records of any firearms registrations by the defendant.

Interview of SPAFFORD

8. On December 17, 2024, law enforcement executed an arrest warrant for SPAFFORD pursuant to a federal criminal complaint charging him with possession of an

4

unregistered short barrel rifle. For safety purposes, SPAFFORD was arrested outside his property at a traffic stop while he was driving to work. Immediately following his arrest, law enforcement began executing a federal search warrant at the Smithfield property, which consisted of a team of federal agents, explosives experts, and local law enforcement officers, and took several days. Law enforcement who arrested SPAFFORD provided him with warnings pursuant to *Miranda v. Arizona*, and SPAFFORD agreed to speak with agents.

9. SPAFFORD was asked about having a short barrel rifle and stated he did not know how long the barrel was and, when asked whether he knew it would have to be registered, stated that he "never really thought about it."

10. SPAFFORD denied any involvement with improvised explosive devices ("IEDs"), claiming "all I've worked on is fireworks" and that he injured his hand with fireworks. Early in the interview, agents told SPAFFORD the Smithfield property was in the process of being searched, and repeatedly asked him whether there was anything on the property that could endanger the safety of anyone there, which SPAFFORD repeatedly falsely denied throughout the course of the 2 hour and 45 minute interview. Excerpts are below:

> Q. *(referring to execution of search warrant)* And nothing that's gonna hurt them there, nothing that's going to...?
> A. No...no. ... There's guns locked up in the safe, had the gun in my car, ... and my lunchbox. Just unloaded guns. I keep everything safe with the kids around.
>
> ...
>
> Q. Somebody mentioned ... a shed or something. ... Is there anything in there that would be of concern?
> A. ...There are several buildings out there ... the only place I've got ammo, gunpowder is in the garage.
> Q. Do you keep any of the old fireworks that you made ... are those around anywhere?
> A. Probably ... honestly ... I don't know what to do with it. I don't know how to get rid of it.

| | |
|---|---|
| Q. | … I'm just saying if it is let us know so we can let them know where it's at. That way they're not… |
| A. | Just the components. I've got boxes with the components and powders and stuff … |
| Q. | Maybe in the garage somewhere or like boxes in the house? |
| A. | … in the garage, yes, but none of that's dangerous. … I don't know how to dispose of fireworks. How do you dispose of fireworks? |

. . .

| | |
|---|---|
| Q. | Have you ever messed with Tannerite … stuff like that? |
| A. | I don't have any Tannerite. |

. . .

| | |
|---|---|
| Q. | Nothing else that you can think of that would be of concern for them out there? |
| A. | …. no. (*note: he mumbles this and it's possible he states "I don't know."*) |

. . .

| | |
|---|---|
| Q. | You said it's fireworks and explosives. Anything else you made or kind of played with or were thinking about making? |
| A. | Like, like what? |
| Q. | IEDs…other…I don't what else can you make. |
| A. | IEDs…in America? |

. . .

| | |
|---|---|
| Q. | There's nothing out there to hurt anybody? … |
| A. | (*shaking head*) No. There's nothing … there's nothing out there that's going to hurt anybody. I'm not trying to hurt anybody. |

11. Agents specifically asked SPAFFORD about having HMTD, which he acknowledged he had made and researched, and that he kept it in the freezer in his garage at the Smithfield property. He stated he had the HMTD for four years, had moved it to the Smithfield property, but was "scared to do anything with it." When asked whether it would be a concern if his children accessed the HMTD, he responded "I don't know."

<u>Search Warrant Execution</u>

12. At the same time as the execution of the arrest warrant, the FBI executed search

warrants for the Smithfield property, SPAFFORD's person, and vehicles. In a safe in the master bedroom of SPAFFORD's house, agents found a Palmetto State Armory PA-15 rifle, which was later determined to have a 10.5-inch barrel, consistent with the appearance of the firearm in the image SPAFFORD had shared previously with the CHS. Agents also found ammunition compatible with the rifle. ATF tested the rifle and found it to be an operable firearm.

13. The FBI also found approximately 155 improvised explosive devices ("IEDs") at the Smithfield property, which appeared to be homemade pipe bombs. All but six were found in the garage, which was unlocked at the time of the search. The garage also was used to store household items and children's toys. Most of the IEDs were found in ammunition canisters. Others with a yellow top were loaded in a brown canvas item depicted below. The remaining six were found in a backpack on the floor of the master bedroom, consisting of three sets of two devices connected to each other. Some of the IEDs had handwritten identification on them, including "lethal" and "concussion." Example images are below:







14.     The IEDs were grouped based on appearance, characteristics, and fusing systems. One from each group was rendered safe, for a total of nine, numbered in FBI records as Devices #1 through #9 as depicted below, which were subsequently analyzed by an FBI explosives laboratory.



The remaining IEDs were detonated on scene for safety reasons. Of the nine analyzed devices,

9

all nine were determined to be IEDs or homemade bombs, consisting of an explosive main charge and initiating system. One device, Device #9 with the yellow top, was found to have propellant capabilities consistent with use in a launcher. In addition, all devices except Device #6 (shown at left in the immediate picture above) contained hardened plastic containers and/or metal or hard plastic spheres that rendered the IEDs capable of causing property damage, personal injury, and/or death, rendering them destructive devices. Approximately 25 of the IEDs were consistent in appearance with Device #6. An example x-ray showing spheres included in one device is below:



15.　　Also in the defendant's garage, the FBI found numerous materials indicative of the manufacture of IEDs, including IED components like hobby fuses, powders, metal spheres, and cut pieces of PVC pipe, and equipment including a device to grind powder, a colander, and a mixing bowl with a powdered substance. Agents also found riot gear, Tannerite, two empty grenade canisters and an improvised homemade claymore, or mine. There were also numerous precursor chemicals that can be used to manufacture explosive materials. Agents also found

numerous rounds of homemade ammunition, including plastic bags hand-labeled as rounds that were "alcohol cleaned," consistent with the "biometric" bag the defendant had mentioned to the CHS.

16. Also in the garage was a clear bag hand-labeled "ETN," which an on-scene test confirmed to be in fact ETN, and a substance labeled "Tannerite." In a freezer in the garage, agents found a jar consistent with the HMTD SPAFFORD described to the CHS and in his interview. As depicted below, it was stored near Hot Pockets, popsicles, and Go Gurt.



11



The Mason jar was detonated on scene and a soil sample from the explosion was negative for HMTD, which could be caused by degradation of the substance or the imprecision of the soil sampling method.

17. In the home in a notebook bearing the label of the defendant's employer, agents found numerous handwritten recipes and notes regarding how to manufacture explosive materials and devices, as well as inventories of the same. This included a recipe for HMTD, noting it was "very sensitive to friction/shock/flame," a recipe for ETN, a list of grenades with different colors, and instructions for how to make various grenades including "stinger" and "concussion" grenades.

<u>Review of Electronic Devices</u>

18. Agents also seized numerous electronic devices, which were subsequently reviewed. On SPAFFORD's phone, there were numerous videos of detonations by SPAFFORD at the property of Family Member 1 and Family Member 2, in Zuni, Virginia. There were also numerous images of apparent IEDs, both completed and in progress, which were consistent in appearance with those later found at the Smithfield property. One example is below:



19. The defendant had also downloaded documents, books and guides including *Improvised Primary Explosives*, *The Encyclopedia of Poisons and Antidotes*, and *High Energy Materials*.

20. The defendant's phone contained numerous text message discussions about explosive materials and devices:

    a. On or about March 7, 2021, the defendant told Associate 1, "I need nitromethane and we are making c4 . . . 1 gal can make 30lbs boom boom sticks."

    b. On or about April 27, 2021, the defendant told Associate 1 that "[t]his ETN is stupid powerful. It's more than HMTD."

    c. In June 2021, Family Member 1 asked the defendant where they could purchase certain precursor materials, and the defendant referred them to a website he used. The defendant also instructed Family Member 1 that one chemical was more sensitive than another.

    d. On or about June 24, 2021, the defendant asked Associate 1, "When we gonna blow stuff up . . . I got stuff i assembled months ago I need to dispose of." Several days later, Associate 1 asked the defendant what he was doing for the 4th of July, and the defendant responded, "Celebrating america the beautiful with illegal explosives! . . . We can blow up . . . rioters." Later that day, the defendant stated "I keep forgetting to build something while I'm at work."

    e. On or about July 3, 2021, the defendant told Associate 1, "Need something to test the frag on a new 37mm g'nade. . . I get afraid and



also a bone when I look at them."

    f. The defendant and Associate 1 also had discussions shortly after the defendant's accident that disfigured his hand. On or about July 30, 2021, the defendant stated, "No one is asking any more about the accident than just a firework accident. I don't really have a plan if it is investigated by police, hopefully it doesn't but ill stash everything." On or about August 2, 2021, Associate 1 told the defendant that they and Family Member 1 "got you covered as far [as] stashing every thing." The defendant wrote that he heard from Family Member 2 that Associate 1 and Family Member 1 had "picked up all the pieces" following the accident. Several days later, the defendant told Associate 1 to "bring all my stuff back" and that Family Member 1 had recently "[b]rought my rifle back." After Associate 1 agreed, the defendant told Associate 1 to "be super careful with those glasses bottles. That stuff is incredibly dangerous."

    g. On or about July 30, 2024, Family Member 3 wrote the defendant, "We never fulfilled our purpose maybe that's why we're so unfulfilled." The defendant responded, "We should blow up Congress."

21. The seized electronic devices also contained multiple discussions involving the defendant regarding the unlawful use or possession of firearms:

    a. In August 2023, Family Member 4 told the defendant about a meeting of a public school board about a school policy, and the defendant responded, "someone needs to shoot them meetings up."

    b. In October 2023, after Family Member 4 told the defendant they had filled out an ATF registration form for one of their firearms, the defendant responded, "don't register anything." The next month, he stated "I shoot a 10.5 barrel with a stick, I honestly don't worry about the arbitrary backwards ATF rules."

    c. The defendant also had numerous pictures of the same short barrel rifle as that seized at his home, including the below, shown laying below a legal firearm:

14



22.     During the course of the investigation, no specific plans to implement violence or to distribute the subject devices were discovered.

## Conclusion

23.     The evidence and investigation confirm that on or about December 17, 2024, in the Eastern District of Virginia, the defendant, BRAD KENNETH SPAFFORD, did knowingly possess a firearm that was required to have been registered in the National Firearms Registration and Transfer Record, to wit: a Palmetto State Armory PA-15 S/N SCD403476 short barrel rifle; and was not registered to the defendant in the National Firearms Registration and Transfer Record.

24.     The evidence and investigation further confirm that on or about December 17, 2024, in the Eastern District of Virginia, the defendant, BRAD KENNETH SPAFFORD, did knowingly possess a firearm that was required to have been registered in the National Firearms Registration and Transfer Record, to wit: an improvised explosive device identified in FBI records as Device #4; and was not registered to the defendant in the National Firearms Registration and Transfer Record.

25.     This statement of facts includes those facts necessary to support the plea agreement between the defendant and the United States. It does not include each and every fact known to the defendant or to the United States, and it is not intended to be a full enumeration of all of the

facts surrounding the defendant's case.

26. The actions of the defendant, as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

Respectfully submitted,

Erik S. Siebert
United States Attorney

By: _____
E. Rebecca Gantt
Assistant United States Attorney

By: _____
Luke Bresnahan
Assistant United States Attorney

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, BRAD KENNETH SPAFFORD, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
BRAD KENNETH SPAFFORD

I am Jeffrey Swartz, defendant's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
Jeffrey Swartz, Esq.
Attorney for BRAD KENNETH SPAFFORD

I am Lawrence Woodward, defendant's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
Lawrence H. Woodward, Jr., Esq.
Attorney for BRAD KENNETH SPAFFORD